**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **PRIDE INDUSTRIES,** ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:22-cv-1062 |
| ) | |
| **VERSABILITY RESOURCES, INC.,** *et al.*, ) ) | |
| Defendants ) | |

**MEMORANDUM OPINION**

This is a dispute concerning a subcontractor agreement between Plaintiff PRIDE Industries (hereinafter "PRIDE") and defendant VersAbility Resources, Inc. (hereinafter "VersAbility"). The subcontract provided that PRIDE would perform certain work at Naval Base San Diego under a contract that VersAbility had been awarded pursuant to the AbilityOne program, which aims to provide employment opportunities for people who are blind or have other severe disabilities. PRIDE has also sued the AbilityOne Commission and its leaders as well as the nonprofit agency in charge of administering the AbilityOne program, alleging that they failed to intervene in PRIDE's dispute with VersAbility. This matter is now before the Court on each of the defendants' motions to dismiss. All three motions are fully briefed and were argued orally on March 24, 2023. Accordingly, the motions are ripe for disposition.

**I.**

Because this is a Motion to Dismiss, the facts that control disposition of the present Motion are the facts derived from the allegations contained in the Complaint. *See Fairfax v. CBS Corp.*, 2 F.4th 286, 291-92 (4th Cir. 2021). The Complaint's allegations of fact are taken as true solely

for purpose of resolving the Motion to Dismiss, but the Complaint's allegations of law are not accepted as true. *Id.*

Plaintiff PRIDE is a California nonprofit corporation with the mission of employing people with severe disabilities. During the relevant time period, PRIDE served as a subcontractor for Defendant VersAbility. VersAbility, in turn, served as a contractor for the U.S. Navy whereby VersAbility—and PRIDE through its subcontract—provided services at Naval Base San Diego.

In 2002, VersAbility was awarded the Naval Base San Diego contract pursuant to the AbilityOne Program. That program was created by the Javits-Wagner-O'Day Act, 41 U.S.C. § 46 *et seq.*, (hereinafter the "JWOD Act") to provide employment opportunities for people who are blind or have other severe disabilities; it does so through contracts that deliver various products and services to federal government customers, such as military bases. To that end, the JWOD Act established Defendant Committee for Purchase from People Who Are Blind or Severely Disabled (hereinafter the "AbilityOne Commission"), which is tasked with designating Central Nonprofit Agencies to facilitate work distribution among various non-profits. Here, the AbilityOne Commission designated Defendant SourceAmerica as the Central Nonprofit Agency in charge of facilitating work distribution for Naval Base San Diego. SourceAmerica, in turn, designated VersAbility as the nonprofit entity tasked with providing various services associated with loading provisions onto Navy ships, a process known as shipboarding, at Naval Base San Diego. VersAbility began performing shipboarding provisioning services for the Navy in September 2002 and continues to perform those services today.

To fulfil its obligations under the Naval Base San Diego contract, VersAbility entered into various subcontracts with PRIDE which provided that PRIDE would perform shipboarding services. The subcontracts did not provide a specific scope of work that PRIDE would perform;

2

rather, they were "indefinite quantity, indefinite delivery" subcontracts, and set out a process by which PRIDE could propose to provide services. The subcontracts between PRIDE and VersAbility provided that VersAbility retained discretion regarding whether it would seek PRIDE's services. The subcontracts also permitted VersAbility to "suspend, delay, or interrupt all or any part of the Task Order or of this Subcontract for the period of time that [VersAbility] determines appropriate" and further explains that VersAbility could terminate PRIDE at Versability's convenience and without cause. Although VersAbility and PRIDE did not enter into any formal written subcontracts after 2010, PRIDE alleges in the Complaint that it was a de facto subcontractor even after 2010. The Complaint also alleges that various writings and emails memorialize that continuous relationship between PRIDE and VersAbility.

Under its various subcontracts to VersAbility, PRIDE employees loaded provisions onto ships at Naval Base San Diego using mulags, small tractor-like vehicles with conveyor belts, provided by the Navy. The Complaint alleges that many of the mulags eventually stopped working, at which time VersAbility instructed PRIDE on how to perform the services without mulags. PRIDE, dissatisfied with the method VersAbility proposed, requested to use telehandlers—heavy duty forklift machines—to accomplish shipboarding. But VersAbility prohibited PRIDE from using telehandlers because it believed that the Navy prohibited the use of telehandlers for cost reasons. PRIDE, however, continued to use telehandlers in contravention of VersAbility's instructions. Thereafter, VersAbility sent PRIDE a letter ordering PRIDE to cease using telehandlers. After PRIDE failed to acquiesce, VersAbility terminated its contract with PRIDE on March 21, 2022. PRIDE alleges that VersAbility terminated PRIDE not because PRIDE used telehandlers, but rather because VersAbility wished to perform the work itself as a cost-saving measure.

PRIDE alleges that it then asked the AbilityOne Commission and SourceAmerica to intervene in PRIDE's dispute with VersAbility to prevent VersAbility from terminating PRIDE's subcontract with VersAbility. But the AbilityOne Commission and SourceAmerica declined to intervene, claiming that they did not have authority to intervene and reinstate PRIDE as a subcontractor.

PRIDE then brought this suit with the following counts: (1) Breach of Contract against VersAbility; (2) Breach of the Duty of Good Faith and Fair Dealing against VersAbility; (3) Promissory Estoppel against VersAbility (in the alternative to Count 1); (4) Unjust Enrichment against VersAbility (in the alternative to Count 1); (5) Violation of California's Unfair Competition Law against VersAbility and SourceAmerica; (6) Tortious Interference with Prospective Economic Advantage[1] against VersAbility; (7) Conspiracy to Injure PRIDE against VersAbility and SourceAmerica; (8) Administrative Procedure Act (hereinafter "APA") violations against the AbilityOne Commission, Jeffrey A. Koses (Chair of the AbilityOne Commission), and Kimberly M. Zeich (Director of the AbilityOne Commission) (collectively, the "AbilityOne defendants") and SourceAmerica; and (9) Request for injunction pursuant to the APA against the AbilityOne defendants and SourceAmerica. The counts against each party are reflected in the chart below.

| Claims against VersAbility | Claims against SourceAmerica | Claims against AbilityOne defendants |
|---|---|---|
| Count 1: Breach of Contract | Count 5: Violation of California's Unfair Competition Law | Count 8: APA violations |
| Count 2: Breach of the Duty of Good Faith and Fair Dealing | Count 7: Conspiracy to Injure PRIDE | Count 9: Request for Injunction due to APA violations |
| Count 3: Promissory Estoppel (alternative to Count 1) | Count 8: APA violations | |

---

[1] Although the Complaint states a cause of action for "Tortious Interference," PRIDE has confirmed in briefing that the claim is tortious interference with prospective economic advantage. *See* Plf.'s Br. in Opp'n to VersAbility's MTD at 21.

| | | |
|---|---|---|
| Count 4: Unjust Enrichment (alternative to Count 1) | Count 9: Request for Injunction due to APA violations | |
| Count 5: Violation of California's Unfair Competition Law | | |
| Count 6: Tortious Interference with Prospective Economic Advantage | | |
| Count 7: Conspiracy to Injure PRIDE | | |

## II.

Each of the defendants have moved to dismiss all of the claims. It is appropriate to consider in turn (A) SourceAmerica's Motion to Dismiss, (B) the AbilityOne defendants' Motion to Dismiss; and (C) VersAbility's Motion to Dismiss.

### A. SourceAmerica's Motion to Dismiss

To begin with, SourceAmerica's Motion to Dismiss must be granted. This is so because (i) the APA claims asserted by PRIDE against SourceAmerica cannot go forward because SourceAmerica is not an agency subject to the APA, and (ii) the state-law claims are barred by SourceAmerica's sovereign immunity as a contractor.

With respect to the APA claims, the APA permits a reviewing court to "hold unlawful and set aside _agency_ action" that is contrary to law. 5 U.S.C. § 706(2) (emphasis added). The APA defines "agency" as an "authority of the Government of the United States." 5 U.S.C. § 701(b)(1). In considering whether an entity qualifies as an agency, courts generally consider two factors: (1) the entity's structure and (2) the entity's function. *Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 172–77 (D. Md. 1982). When considering an entity's structure, courts look to the statutes and regulations that created the entity to determine whether the entity was statutorily created and the extent to which authority is delegated to the entity. *Id.* And when considering an entity's function, courts look to the entity's overall authority to make decisions and whether it has been vested with substantial powers to act. *Id.*

5

With respect to the first factor—SourceAmerica's structure—SourceAmerica was not created by statute. Rather, it is a nonprofit corporation created pursuant to state law. Thus, the case that PRIDE cites is inapposite. In *Lee Constr. Co.*, 558 F. Supp. at 172, cited by PRIDE, the court considered whether the Federal Reserve Bank of Richmond was an agency. Yet unlike SourceAmerica, which is a nonprofit created under state law, the Federal Reserve Bank of Richmond was created pursuant to the Federal Reserve Act and was subject to great control by the federal government. *Id.* at 177-78. And with respect to the second factor, SourceAmerica's function, SourceAmerica has not been vested with substantial powers to act or with decision-making authority. Indeed, the cooperative agreement between SourceAmerica and the AbilityOne Commission, which is attached to the Complaint, makes clear that SourceAmerica may only make "[r]ecocomend[ations] to the Commission." Compl. Ex. 1, at 12-13. Although PRIDE argues that the AbilityOne Commission sometimes in practice defers to SourceAmerica's recommendations, that fact does not mean that SourceAmerica has decision-making authority or substantial powers to act. Indeed, as the United States Court of Appeals for the D.C. Circuit has noted, an entity does not qualify as an agency merely because it has "great[] influence[]" in decisions; actual decision-making authority is required. *Wash. Rsch. Project, Inc. v. Dep't of Health, Educ. & Welfare*, 504 F.2d 238, 248 (D.C. Cir. 1974). Thus, SourceAmerica here is not an <u>agency</u> because it was not statutorily created, and because SourceAmerica is not vested with any substantial powers or decision-making authority. Accordingly, the APA claims against SourceAmerica must be dismissed, because APA claims are actionable only against agencies.

Next, it is appropriate to consider SourceAmerica's argument that the state-law claims asserted by PRIDE against SourceAmerica are barred by sovereign immunity. Courts have long applied the "well-settled law that contractors and common law agents acting within the scope of

their employment for the United States have derivative sovereign immunity." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000); *see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016) ("Government contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)).  This immunity for contractors, also referred to as derivative sovereign immunity or *Yearsley* immunity, provides government contractors immunity from suit—and is thus a basis for dismissal—for claims based on the contractor's performance of services for the United States where the United States itself would have immunity. *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018).  More specifically, in *Yearsley*, the Supreme Court held that a contractor is shielded by sovereign immunity when (1) the government's sovereign immunity has not been waived; (2) the authority to carry out the contract is validly conferred; and (3) the contractor performed as directed by the government. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940).  PRIDE concedes that the first and second factors have been satisfied here, and thus the sole dispute is whether SourceAmerica performed as directed by the government.  *See id.*

PRIDE argues that SourceAmerica did not perform pursuant to the agreement with the AbilityOne Commission when it failed to intervene in VersAbility's decision to terminate PRIDE as a subcontractor.  But PRIDE's argument runs counter to recent Fourth Circuit precedent.  In *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 648-49 (4th Cir. 2018), the Fourth Circuit noted that "[t]he purpose of *Yearsley* immunity is to prevent a government contractor from facing liability for an alleged violation of law, and thus, it cannot be that an alleged violation of law per se precludes *Yearsley* immunity."  888 F.3d at 648-49.  The relevant inquiry, rather, is whether the AbilityOne Commission authorized SourceAmerica's decision not to intervene in

7

PRIDE's dispute with VersAbility. And on this point, there can be no doubt that the AbilityOne Commission authorized SourceAmerica's decision; that very fact is the heart of PRIDE's Complaint. Indeed, PRIDE alleges that it asked SourceAmerica *and* the AbilityOne Commission to intervene, and both rejected PRIDE's request. Am. Compl. ¶ 111. Accordingly, SourceAmerica is shielded from PRIDE's state-law causes of action, pursuant to the *Yearsley* doctrine.

In sum, the APA claims asserted by PRIDE against SourceAmerica fail because SourceAmerica is not an *agency*. And the state-law claims are barred by SourceAmerica's sovereign immunity as a contractor. Accordingly, SourceAmerica's Motion to Dismiss counts five, seven, eight, and nine must be granted.

### B. The AbilityOne Defendants' Motion to Dismiss

Next, the AbilityOne defendants filed a Motion to Dismiss the APA claims asserted by PRIDE. The AbilityOne defendants argue, *inter alia*, that PRIDE lacks standing to sue. Article III of the Constitution limits federal court jurisdiction to "Cases" and "Controversies," and this limitation is implemented, in part, by the standing doctrine. The "irreducible constitutional minimum" of standing consists of three elements: the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). And "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* Where, as here, a "case is at the pleading stage," the Complaint must "allege facts demonstrating" each element "clearly." *Id.*

The AbilityOne defendants argue that PRIDE has not satisfied the standing requirement because PRIDE has not demonstrated, *inter alia*, that its injury is likely to be redressed by a

8

favorable judicial decision.  This is so because PRIDE has not identified a single provision of statute or federal regulation that vests the AbilityOne Commission with the authority to reinstate a subcontractor that has been terminated by a contractor, as PRIDE alleges happened here. PRIDE's citation to 41 C.F.R. § 51-3.4 is unavailing because that section provides only that, if there are two or more nonprofits designated as the primary contractors for a project, the central nonprofit entity shall split the work amongst those primary contractors "in a fair and equitable manner."  41 C.F.R. § 51-3.4.  That regulation does not allow the AbilityOne Commission to interfere with contract disputes of the sort alleged here, and, in any event, PRIDE was only a subcontractor; VersAbility was the primary contractor.

PRIDE's reliance on an operating memorandum by the AbilityOne Commission is similarly unavailing.  *See* Fed. Defs. Br. at Ex. A, Operations Memorandum 21 (hereinafter "AbilityOne Memorandum").  That Memorandum "provides guidance on the procedures to be followed by [central nonprofit entities] and [primary nonprofits] when seeking and establishing subcontracts."  *Id.* at 1.  Yet importantly, that memorandum states that prime contractors and subcontractors have a "traditional" relationship, *see id.* at 5, and it is clear that such traditional relationships operate in a manner where "[w]hether a subcontractor will continue to hold a subcontract for a service is at the discretion of the contractor, not the competitive procurement process or the Government contracting activity."  67 Fed. Reg. 31762-02, 31763 (May 10, 2022). Simply put, the memorandum that PRIDE contends demonstrates that the AbilityOne Commission had the authority to intervene in PRIDE's dispute with VersAbility actually makes clear that it lacked such authority.

Thus, PRIDE has failed to identify any basis in law or regulation that would allow the AbilityOne Commission to intervene in a dispute between PRIDE and VersAbility.  Accordingly,

9

PRIDE has failed to demonstrate that any injury it suffered is redressable by the AbilityOne defendants and therefore lacks standing to bring a claim against the AbilityOne defendants. Accordingly, the AbilityOne defendants' Motion to Dismiss must be granted.

### C. VersAbility's Motion to Dismiss

VersAbility argues that each of the seven claims against it should be dismissed. First, VersAbility argues that the Federal Enclave Doctrine bars four of those claims, namely (i) Breach of the Duty of Good Faith and Fair Dealing (Count 2); (ii) Unjust Enrichment (Count 4); (iii) Violation of California's Unfair Competition Law (Count 5); and (iv) Tortious Interference with Prospective Economic Advantage (Count 6). Second, VersAbility argues that the Tortious Interference with Prospective Economic Advantage Claim (Count 6)—if not barred by the Federal Enclave Doctrine—and the Conspiracy to Injure claim (Count 7) must be dismissed for failure to state a claim upon which relief can be granted. Finally, VersAbility argues that the Breach of Contract claim (Count 1) and the Promissory Estoppel claim (Count 3) are barred by the Statute of Frauds. Each of VersAbility's three arguments is addressed in turn.

#### i. The Federal Enclave Doctrine

The Federal Enclave Doctrine stems from Congress's power under the Constitution "[t]o exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const. art. I, § 8, cl. 17. Based on this provision, the Supreme Court has held that "when an area in a State becomes a federal enclave, only the state law in effect at the time of the transfer of jurisdiction continues in force" and that "going forward, state law presumptively does not apply to the enclave." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (internal citations, quotation marks, and alterations omitted). Here, as

10

all parties agree, Naval Base San Diego became a federal enclave on February 23, 1922.  Thus, pursuant to the Federal Enclave Doctrine, all of PRIDE's claims asserting a violation of a state law that did not exist on February 23, 1922 are barred, so long as the conduct underlying the claim occurred at Naval Base San Diego.

As a threshold matter, PRIDE and VersAbility disagree about whether the at-issue events giving rise to PRIDE's claims occurred on Naval Base San Diego.  PRIDE argues that its claims arise from conduct and harm that occurred outside of Naval Base San Diego.  Specifically, PRIDE argues that the dispute arises from a contract that was physically negotiated somewhere other than Naval Base San Diego, and that any plans to interfere tortiously were made outside of Naval Base San Diego.  VersAbility, by contrast, argues that, for purposes of the Federal Enclave Doctrine, the at-issue conduct occurred on Naval Base San Diego because the contract concerns activities at Naval Base San Diego.  Here, VersAbility is correct.  In the employment context, courts have held that employees who worked on a federal enclave cannot bring claims against their employer by arguing that the employment contract was signed and negotiated outside of the enclave; the fact that the underlying conduct occurred at a federal enclave bars the employee's claims.  Indeed, as one court noted, "the plaintiff's place of employment," not the place at which the employment contract was entered, is "the significant factor in determining" whether a claim is barred by the Federal Enclave Doctrine.  *Lockhart v. MVM, Inc.*, 97 Cal. Rptr. 3d 206, 212 (Cal. Ct. App. 2009).  This logic applies equally here.  Because the events underlying each of PRIDE's claims focused on activity at Naval Base San Diego, the Federal Enclave Doctrine applies.  Thus, PRIDE's arguments that the claims at issue did not occur at a federal enclave are unavailing.

The next issue is whether each of the four claims that VersAbility contends is barred by the Federal Enclave Doctrine is based on a state law that was not in existence on February 23,

1922, the date on which Naval Base San Diego became a federal enclave. Specifically, VersAbility contends that the Federal Enclave Doctrine bars the claims of (i) Breach of the Duty of Good Faith and Fair Dealing (Count 2); (ii) Unjust Enrichment (Count 4); (iii) Violation of California's Unfair Competition Law (Count 5); and (iv) Tortious Interference with Prospective Economic Advantage (Count 6). For those claims to be barred, each of those claims must be based on a state law that was not in existence on February 23, 1922.

The Breach of the Duty of Good Faith and Fair Dealing claim is barred by the Federal Enclave Doctrine. California first recognized breach of the duty of good faith and fair dealing as a tort in in 1958. *See Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198 (Cal. 1958) (recognizing that, not only is there an implied duty of good faith and fair dealing in every contract, but also that a violation of such duty gives rise to a cause of action); *see also Foley v. Interactive Data Corp.*, 765 P.2d 373, 412 (Cal. 1988) (Kaufman, J., concurring in part and dissenting in part) (tracing the origin of California's tort for breach of the duty of good faith and fair dealing to *Comunale*). Although PRIDE points to cases before 1922 recognizing that parties have a duty of good faith and fair dealing, those cases did not recognize violation of that duty as an actionable tort. *See Clark v. Boyreau*, 14 Cal. 634, 636 (Cal. 1860) (noting that each party to a contract has a duty to ensure "good faith and fair dealing," but not providing for a cause of action if such a duty is violated). Accordingly, in California, the actionable tort for the breach of the duty of good faith and fair dealing was created after Naval Base San Diego was established as a federal enclave, and is thus barred by the federal enclave doctrine here.

The same is true of PRIDE's Claims for unjust enrichment. Indeed, to date, California has not explicitly recognized a tort of unjust enrichment. As one California appellate court noted, "there is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods.,*

*Inc.*, 131 Cal. Rptr. 2d 347, 357 (Cal. Ct. App. 2003).  Rather, in California, unjust enrichment is a "general principle, underlying various legal doctrines and remedies." *Dinosaur Dev., Inc. v. White*, 265 Cal. Rptr. 525, 527 (Cal. Ct. App. 1989).  The cases PRIDE cites in opposition to such a conclusion are inapposite, as they confirm that unjust enrichment is a theory underlying other causes of action rather than a distinct cause of action itself.  *See*, *e.g.*, *French v. Robbins*, 158 P. 188, 191 (Cal. 1916) (noting that the reason that another cause of action exists is to prevent "the unjust enrichment of the wrongdoer").  Accordingly, because California has not yet recognized a tort of unjust enrichment, the Federal Enclave Doctrine precludes PRIDE's claim in this regard.

PRIDE's claim that VersAbility violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, is also barred by the Federal Enclave Doctrine.  As even PRIDE acknowledges, that law was enacted in 1977.  *See id.*  PRIDE attempts to argue that, because a legal commentator traced the history of California's unfair competition law back to an 1872 statute, the relevant year for assessing whether the Federal Enclave Doctrine serves as a bar is 1872, not 1977.  But the very same legal commentator noted that the unfair competition law, as it stands today, is markedly different from the original 1872 statute, which did not even provide for relief from "unfair competition" at the time.  See Wesley J. Howard, *Former Civil Code Section 3369: A Study in Judicial Interpretation*, 30 Hastings L.J. 705, 706 (1979).  Accordingly, because the Unfair Competition Law was enacted in 1977, PRIDE's attempt to save its unfair competition law claim from the Federal Enclave doctrine fails.

PRIDE's claim for tortious interference with prospective economic advantage, however, is not barred by the Federal Enclave Doctrine.  The focal point of PRIDE's claim in this regard is that VersAbility tortiously interfered with PRIDE's employee relationships.  And such claims for tortiously interfering with employment relationships have been recognized in California at least

13

since 1919. In *Patterson Glass Co. v. Thomas*, 183 P. 190 (Cal. Dist. Ct. App. 1919), a California court held that tortious interference claims can proceed where the relationship allegedly interfered with is an employment relationship. The *Patterson Glass Co.* court spent many pages on determining whether the relevant employment contract was at-will, but concluded that in any event, a cause of action for tortious interference with at-will contracts exists because it is not "lawful to induce to quit employment . . . even in the absence of any contract to serve for a fixed period." *Id.* at 194 (internal quotation marks and citation omitted). It is therefore clear that California recognized a cause of action for tortiously interfering with employment at least as early as 1919, before Naval Base San Diego became a federal enclave in 1922. VersAbility does not cite to *Patterson Glass Co.*; it argues only that it could not locate a case from before 1922 recognizing a cause of action for tortiously interfering with employment. Nevertheless, such a case exists, and the Federal Enclave Doctrine does not serve as a bar to PRIDE's tortious interference claim.

In summary, three of PRIDE's claims against VersAbility are barred by the Federal Enclave doctrine, namely the claims for (i) Breach of the Duty of Good Faith and Fair Dealing (Count 2); (ii) Unjust Enrichment (Count 4); and (iii) Violation of California's Unfair Competition Law (Count 5).

### ii. Failure to State a Claim

VersAbility next argues that two of the four remaining claims should be dismissed for failure to state a claim upon which relief can be granted. Specifically, VersAbility argues that the Tortious Interference with Prospective Economic Advantage claim and the Conspiracy to Injure claim must be dismissed.

To begin with, the Tortious Interference with Prospective Economic Advantage claim is not subject to dismissal at this stage. To state a claim for tortious interference with prospective economic advantage under California law, PRIDE was required to allege facts sufficient to demonstrate (i) a relationship between PRIDE and a third-party with the probability of future economic benefit to PRIDE; (ii) VersAbility's knowledge of that relationship; (iii) intentional wrongful acts by VersAbility designed to disrupt that relationship; (iv) actual disruption of that relationship; and (v) economic harm to PRIDE. In this regard, PRIDE alleges that VersAbility tortiously interfered with PRIDE's relationships with its at-will employees. VersAbility, for purposes of the Motion to Dismiss, challenges only the third element—that VersAbility committed intentional *wrongful* acts designed to disrupt PRIDE's relationship with its employees.

VersAbility is incorrect; PRIDE has sufficiently alleged that VersAbility committed wrongful acts. Under California law, an allegation of an unfair business practice is sufficient to allege the requisite wrongful act; indeed, the Supreme Court of California has made clear that "a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999). An unfair business practice is one that "is immoral, unethical, oppressive, unscrupulous or substantially injurious." *Bardin v. DiamlerChrysler Corp.*, 36 Cal. Rptr. 3d 634, 642 (Cal. Ct. App. 2006). In this regard, PRIDE has alleged that VersAbility repeatedly informed PRIDE that VersAbility would continue to contract with PRIDE, but that VersAbility had been working in secret to take over PRIDE's work at Naval Base San Diego. *See* Compl. ¶¶ 80-81. PRIDE further alleges that on the same day that VersAbility terminated PRIDE's subcontract, VersAbility representatives threatened PRIDE employees by informing them that they would no longer have a job unless they immediately resigned from PRIDE and accepted an offer from VersAbility to continue to work at Naval Base

15

San Diego. Compl. ¶ 91. This factual material is sufficient at the threshold to allege an unfair business practice, at least at the threshold. VersAbility's conclusory assertion without analysis to the contrary is unavailing. Thus, PRIDE has sufficiently pled a claim for tortious interference with prospective economic advantage.

VersAbility's arguments that PRIDE has not sufficiently stated a claim for conspiracy to injure under California law also fail at this stage. First, VersAbility argues that California does not recognize a cause of action for conspiracy to injure. In support of this proposition, VersAbility points to an out-of-circuit district court case stating that "civil conspiracy is not a separate and distinct cause of action under California law." *AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 947 (N.D. Cal. 2003). But that district court later made clear that a plaintiff can "properly plead a conspiracy cause of action" if the plaintiff pleads underlying tortious conduct. *Id.* Thus, the district court was simply making clear that a properly pled conspiracy claim must also allege an underlying tortious act. Consequently, VersAbility's next argument is that PRIDE has not alleged the requisite wrongful tortious conduct in furtherance of the conspiracy. But, as discussed above, PRIDE has sufficiently alleged a claim for tortious interference with prospective economic advantage, which is the tortious act underlying PRIDE's alleged conspiracy. Thus, PRIDE, at this stage of litigation, has sufficiently stated a claim for conspiracy to injure under California law.

### iii. Statute of Frauds

Finally, VersAbility argues that the Statute of Frauds bars PRIDE's claims for Breach of Contract (Count 1) and Promissory Estoppel (Count 3). The Federal Rules of Civil Procedure provide that the Statute of Frauds is an affirmative defense. *See* Rule 8(c), Fed. R. Civ. P. And it is well established that such affirmative defenses may serve as a basis to dismiss a Complaint only

if all the facts necessary to establish the defense are clear from the plaintiff's pleadings. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (noting that a motion to dismiss usually "cannot reach the merits of an affirmative defense").

Here, however, all of the facts necessary to establish a statute of frauds defense are not apparent from the Complaint. Although VersAbility argues—as it must to assert a Statute of Frauds defense—that there was no written contract in effect, the Complaint nonetheless asserts that there were subsequent writings over the years reflecting agreements on material terms. Specifically, the Complaint alleges that VersAbility and PRIDE "repeatedly renewed and extended the terms of their subcontractor relationship." Compl. ¶ 64. In doing so, according to the Complaint, the parties communicated about material terms—such as "pricing and staffing needs"—via writing and electronic communication. Compl. ¶ 65. Indeed, the Complaint alleges that VersAbility and PRIDE operated in this manner—with the material terms of their agreement being agreed upon via email—multiple times. Compl. ¶¶ 74-75. Thus, at this stage, the Complaint contains sufficient allegations to preclude VersAbility's statute-of-frauds defense. Of course, this conclusion only precludes threshold dismissal on the basis of the statute of frauds; VersAbility is not precluded from renewing the statute-of-frauds defense on a more ample and thorough factual record.

### III.

In summary, SourceAmerica's and the AbilityOne defendants' motions to dismiss are granted in full. PRIDE's APA claims against SourceAmerica fail because SourceAmerica is not an agency, and thus those claims must be dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P. And PRIDE's state-law claims against SourceAmerica are barred by sovereign immunity, and thus must be dismissed pursuant to Rule 12(b)(1), Fed. R. Civ. P. PRIDE's claims against the AbilityOne

defendants must be dismissed pursuant to Rule 12(b)(1), Fed. R. Civ. P., because PRIDE has failed to demonstrate that the AbilityOne commission could redress PRIDE's injury, a key requirement for standing and consequently for jurisdiction.

VersAbility's Motion to Dismiss must be granted in part and denied in part. The Federal Enclave Doctrine requires dismissal, pursuant to Rule 12(b)(6), of PRIDE's claims for Breach of the Duty of Good Faith and Fair Dealing (Count 2); Unjust Enrichment (Count 4); and Violation of California's Unfair Competition Law (Count 5). But VersAbility's Motion to Dismiss must be denied with respect to the remainder of PRIDE's claims, namely its claims for Tortious Interference with Prospective Economic Advantage (Count 6); Conspiracy to Injure (Count 7); Breach of Contract (Count 1); and Promissory Estoppel (Count 3).

An appropriate Order will issue.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
April 24, 2023

/s/
T. S. Ellis, III
United States District Judge